FILED

SEP 23 2010

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 08-55393-ASW |
| KELMOORE INVESTMENT CO., INC., | Chapter 7 |
| Debtor. | |
| CAROL W. WU, Trustee, | Adv. No. 08-5337 |
| Plaintiff, | |
| vs. | |
| RALPH KELMON; SHAWN YOUNG; AND MATT KELMON, | |
| Defendants. | |

**MEMORANDUM DECISION RE
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before the court is the motion for partial summary judgment ("Motion") filed by Trustee in the adversary proceeding brought by Trustee against three former officers and directors of debtor Kelmoore Investments Co., Inc. ("Debtor"). The Motion is opposed by the three officer/director defendants sued by Trustee. Defendant Ralph Kelmon ("Ralph") was Debtor's CEO from September 1992 to August 2008. Defendant Matt Kelmon ("Matt") is Ralph's son and was Debtor's senior vice president of investments from 1994 to

January 2008. Defendant Shawn Young ("Shawn") is Ralph's daughter and was Debtor's chief financial officer from 1999 to January 2008.

A continued hearing on the Motion was held on August 24, 2010 and the matter has been submitted for decision. Trustee is represented by Linda Sorensen, Esq. of Stromsheim & Associates. Ralph, Matt and Shawn (collectively, "Defendants") are represented by Fenn C. Horton III, Esq. Of Pahl & McCay.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTS

Debtor is a corporation that filed a chapter 7 bankruptcy petition on September 24, 2008. Plaintiff is the Trustee of Debtor's chapter 7 bankruptcy case. Debtor was founded by Ralph and operated as a family business for many years. In 2001, outside shareholders were brought into Debtor. Debtor earned management fees and commissions by serving as the investment advisor and broker/dealer to the Kelmoore Strategic Trust ("KST") which managed three mutual funds. Debtor also earned advisory fees from separately managed accounts.

Between January 2001 and January 2006, Debtor made the series of loans to Matt, Shawn and Ralph. Specifically:

(1) Matt borrowed an aggregate of $251,000, based on:

    (a) a note payable for $75,000 dated and signed September 26, 2001;

    (b) a note payable for $28,500 dated and signed

Case: 08-05337  Doc# 60  Filed: 09/23/10  Entered: 09/30/10 04:59:35  Page 2 of 17
MEMORANDUM DECISION RE MOTION
FOR PARTIAL SUMMARY JUDGMENT
2

October 15, 2002; and

    (c)  a note payable for $127,500 dated October 31, 2005 and signed January 19, 2006.

(2)  Shawn borrowed an aggregate of $80,000 based on:

    (a)  a note payable for $25,000 dated and signed August 12, 2002;

    (b)  a note payable for $30,000 dated and signed December 30, 2002; and

    (c)  a note payable for $25,000 dated and signed December 7, 2004.

(3)  Ralph borrowed an aggregate of $75,500, based on:

    (a)  a note payable for $16,000 dated and signed December 2, 2002;

    (b)  a note payable for $40,000 dated and signed September 9, 2003; and

    (c)  a note payable for $19,500 dated and signed October 31, 2005.

Each promissory note has an interest rate at the short term applicable federal rates published monthly by the IRS for the month in which the promissory note was dated. Interest accrues monthly on the unpaid balance and the note is due in full at the time of separation from Debtor.

    Each of the three notes executed by Matt and the three notes executed by Shawn bear the notation: "Paid in Full / Ralph M. Kelmon / C.E.O. / 1-3-2008." According to Defendants, at the time that the notes were made, Shawn and Matt were informed that the loans were a form of additional compensation and that if both individuals continued working for Debtor, the loans would

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Case: 08-05337  Doc# 60  Filed: 09/23/10  Entered: 09/30/10 04:59:35  Page 3 of 17
MEMORANDUM DECISION RE MOTION
FOR PARTIAL SUMMARY JUDGMENT
3

eventually be forgiven Matt and Shawn would each have the opportunity to turn in stock at the rate of $1 per share as collateral for the loans.

In January 2004, Debtor settled a lawsuit with a former officer, Thomas Killilea ("Killilea"). Pursuant to that settlement Debtor agreed to repurchase Killilea's shares of Debtor's stock to $1 per share. In order to fund the settlement, Debtor resold most of Killilea's shares to outside investors for $1 per share and Debtor repurchased 150,000 shares for $150,000.

In 2005, Debtor entered into a voluntary settlement with the Securities and Exchange Commission ("the SEC Settlement") which, according to Defendants, dramatically altered Debtor's business model going forward as well as Debtor's ability to generate revenue from advisory fees and commissions. Defendants contend that, mainly as a result of the SEC Settlement, Debtor's revenues declined from $14.5 million in 2005 to $8 million in 2006 and $5.1 million in 2007.

According to Defendants, in 2007, relations between the inside members of Debtor's board of directors and the outside members grew increasingly hostile and antagonistic as Debtor's income continued to drop. According to Defendants, Ralph and Matt made some general inquiries regarding a possible sale, partial sale, or merger of the business. According to Defendants, around June 14, 2007, Debtor received a non-binding letter of interest from CIT/CCM partners to acquire all of Debtor's assets with a purchase price left open. According to Defendants, around June 28, 2007, Debtor received a firm proposal from Dunham & Associates to acquire Debtor where Debtor was valued between $5 million and $10 million.

According to Defendants, Ralph asked the Debtor's board to consider the CIT/CCM partners and Dunham offers at a board meeting held on August 15, 2007. Page 7 of the approved minutes from the August 15 board meeting states that the Board of Trustees: "[T]hat Management is authorized to pursue with all due speed the sale of the firm for not less than the appraisal value to be determined from the appraisal firm now engaged to report in approximately 3 weeks."

On September 24, 2007, Debtor's board of directors met and passed a resolution approving the letter of intent with CIT/CCM partners and also passed a resolution requiring the collection of outstanding employee promissory notes by January 2, 2008. Regarding the repayment of the employee loans, page 11 of the approved minutes from the September 24, 2007 board meeting states:

> WHEREAS, the Board of Directors, after due deliberation and discussion, deems it to be in the best interests of the Company and its shareholders, to require that all loans from the company made to officers, directors, employees or shareholders shall be repaid by January 2, 2008, or if the company is subject to a legally binding agreement for sale by said date, that the first proceeds distributable to the borrowing officers, directors, employees or shareholders shall be used to satisfy their loan obligations to the company
>
> NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors hereby directs that the CFO require repayment of all employee loans by January 02, 2008 or if the company is subject to a legally binding agreement for sale by said date, that the first proceeds distributable to the borrowing officers, directors, employees or shareholders shall be used to satisfy their loan obligations to the company.
>
> RESOLVED FURTHER, that Ralph Kelmon, the Company's CEO, and Shawn Young, the Company's Chief Financial Officer, be, and hereby are, authorized and directed to take any and all actions that they may deem necessary or appropriate to effect the intent of the foregoing resolution.

According to Defendants, shortly after the September 24, 2007 board meeting, Matt and Shawn informed Ralph that Matt and Shawn were going to resign to pursue other employment opportunities. According to Defendants, Ralph was particularly concerned with this news because the value of Debtor to a suitor would be seriously impaired is Debtor lost Debtor's senior vice president of investments and Debtor's CFO shortly before a sale could be completed. Matt also sat on the board of directors of KST -- Debtor's main customer and revenue source. According to Defendants, Ralph was concerned that if Matt left Debtor, the KST contract could be put in jeopardy. According to Defendants, between September 24, 2007 and October 31, 2007, Ralph negotiated agreements on behalf of Debtor to keep Matt and Shawn employed with Debtor until a sale could be completed.

Based on an email string included in Trustee's supplemental papers, sometime on or before 10:29 a.m. on Wednesday, October 24, 2007, Shawn sent an email to Scott Rodde -- one of the outside directors. Shawn's email addresses the repayment of a note held by an employee, Alex Kim, who was being terminated and that the repayment of the note could not be made from accrued vacation or payroll or Debtor would be in violation of the Labor Code. With respect to the notes receivable from Ralph, Matt and Shawn, Shawn's email states in relevant part:

> The Board is advised to approach them individually and work out a mutually agreeable repayment plan. It is not advised to threaten firing them. Rather, the Board may advise them that not having a repayment schedule established may impact their bonus or raise next year. Repayment of notes out of stock proceeds makes sense because we are not up against the labor code.

Case: 08-05337    Doc# 60    Filed: 09/23/10    Entered: 09/30/10 04:59:35    Page 6 of 17

Scott Rodde's reply sent at 10:29 a.m. on October 24, 2007, provides in relevant part:

> . . . please provide a schedule to show how the CIT sale (assuming only the minimum payments are made) will provide the funds to liquidate the notes of Ralph, Matt and you. This schedule should be specific to each borrower, show the total owed to the corporation by each individual, including accrued and continuing interest, the number of the corporation's shares held by each borrower and the schedule of payments flowing from the sale to CIT that will be applied to the debt based on individual shares owned. Please provide this schedule by the end of the week.
>
> If any of the individual borrowers wish to pay their debt by a date certain, rather than from share proceeds that must be communicated to the Board by Wednesday October 31. It [sic] there is a shortfall from the CIT sale, based on your analysis, the individual borrower's plan to liquidate the debt to the corporation must also be communicated to the Board by Wednesday October 31.

Shawn replied that Shawn would provide the requested schedules by Friday.

Per an email sent by outside board member Richard Hajjar ("Hajjar") on Tuesday, October 30, 2007 at 9:56 a.m., further communications between Ralph and the outside board members was to go through Hajjar. Hajjar's October 30 email provides in relevant part:

> Larry Klein is in the process of putting together a resolution regarding the repayment of loans for Kelmoore employees. Once the resolution is complete, I'll forward a copy to you for review. In conjunction with this, Scott had asked Shawn to provide a detailed schedule of the notes with various scenarios for repayment. Could you get with Shawn and then e-mail the schedule to me when it is completed.

Ralph replied to Hajjar's email at 1:09 p.m. on Tuesday, October 30, 2007, stating in relevant part:

> I am more than happy to deal with you on issues from here on out. I propose that KIC [Debtor] take shares at $1 each as repayment for the notes. This is the exact figure that was paid to Tom Killilea for his shares.

> Clearly, Matthew, Shawn and I have been greatly more
> valuable to the company during our 14, 8 and 16 years of
> service, respectively. I told Matthew and Shawn that the
> loans could be repaid with Kelmoore Stock at a time when
> I, as CEO and Chairman, had complete and explicit
> authority and voting control via the voting trust. I
> propose this be part of our completion agreement. I
> believe this will be beneficial for KIC shareholders in
> two ways. Firstly, money coming in from the sale will be
> taxable, the note forgiveness will increase next year's
> loss, and the more we shelter proceeds, the higher the
> payout to the individual shareholders. Secondly, as key
> employees going forward during both the extremely
> important transition and "workout" periods, having the
> note issue behind us is in the best interest of all.,
> [SIC] both the Buyer and the Seller, including the
> Directors and employees -- which is ultimately in the
> best interest of shareholders. The three noteholders
> stand ready to deliver the shares at "high noon" on
> January 2, 2008 or any other time after that date the
> Board determines is more appropriate for business
> reasons.

On October 31, 2007, Debtor issued letters to Shawn and Matt stating in consideration for the years of service and dedication to Debtor and consistent with the previous stock buy-back entered into by Debtor with another employee, Debtor offered to redeem no than January 4, 2008 the amount of Debtor's common shares at the rate of $1 per share necessary to cancel all of the outstanding promissory notes Matt and Shawn owed to Debtor.

According to Defendants, on Thursday, November 1, 2007, Ralph received an email from Hajjar stating that Debtor's board had discussed Ralph's proposal regarding the repayment of the notes and the outside board members agreed that the $1 per share price was too high. Hajjar's November 1, 2007 email states in relevant part:

> The group of outside directors have discussed your
> proposal regarding the repayment of the notes. We are
> all in agreement that the value of $1.00 per share is too
> high, although this price was used in the Tom Killilea
> transaction, we currently have an outside valuation and
> an offer on the table for about 10.9 cents per share. We
> used the low end of the sale price per share because this
> is the amount that is guaranteed.

> Keep in mind that when we send out the proxy for KIC
> shareholders to vote for the sale to CIT we have to
> include how assets were/will be accounted for. The notes
> are on the books as an asset. Given the sentiment of
> some of the more vocal outside shareholders, we cannot
> justify a share price of $1.00 to pay off the notes due
> vs 10.9 to 28.3 cents for the sale of the remaining
> assets of KIC.
>
> With the above in mind, we would like Larry Klein to go
> forward with the resolution we originally mentioned
> regarding the notes.

Ralph replied to Hajjar's November 1, 2007 email stating:

> Hi Rick, The proposal is no a proposed idea. It is a
> fact that while the Company was under the voting trust
> agreement, I agreed that the $1.00 per share price would
> be used for repayment. The precedent for that price was
> the negotiated price that was paid to Tom Killilea in my
> settlement of his suit against Kelmoore Investment
> Company and me. It was acceptable to Tom who was leaving
> the Company; it provided me with a basis for good, loyal,
> and productive employees in a difficult time. I had the
> power and authority to do it under the Voting Trust
> Agreement, and I did it. It enabled me to keep the
> Company going and retain valuable employees. We are
> having more difficult times now. I hope this ends the
> discussion. There is no need for any resolution as my
> actions resolved the note problem when the notes were
> granted. Larry Klein drew up the trust and Duncan King
> was present and he acknowledged the power I was getting.
> I hope this hurdle is behind us. Regards, Ralph

On January 3, 2008, Matt, Shawn and Ralph each completed a form directing the corporate secretary to cancel the appropriate number of shares of Debtor's stock consistent with the outstanding loans for each individual. Also on January 3, 2008, Ralph wrote in each of the promissory notes of Matt and Shawn "Paid in Full."

According to the minutes of a board meeting held on January 8, 2008, the board moved to disapprove of Ralph's actions relating to the notes receivable. The minutes from the January 8 board meeting at pages 5 to 6 provide in relevant part:

> Mr. Rodde asked about the impairment of Notes Receivable.
> The board then discussed the pluses and minuses of

employee notes that were retired with the return of Kelmoore Common Stock. The CEO said he had made promises to the employees before when the notes were initially approved and he sought outside legal advice before he approved the acceptance of Kelmoore Stock for repayment of the personal notes. He stated that his primary responsibility as CEO was to make sure the key employees stayed on during this period of possible sale of the Company. He could not complete the deal, the audit, and the SEC response without them. The notes involved Mr. R. Kelmon, CEO, Mr. M. Kelmon, SEVP Portfolio Management and Ms. Young, CFO. A lengthy discussion ensued about whether the approval for the debt repayment was appropriate and why the board had not been further consulted before the final action. The CEO felt he was given the authority to retire the notes, and, given the critical time for the Company, he knew he would lose key employees that had recently accepted two large pay-cuts. Mr. M. Kelmon and Ms Young said the reason they stayed on through the audit and to remain to close the CIT deal was because the CEO had agreed to accept the stock in repayment as he had previously promised as CEO of the Company. The outside board members expressed their dissatisfaction with the approval and the share price. Mr. Rodde wanted it reviewed to assure there were no self-dealing and pricing issues and was of the opinion it was highly questionable.

Mr. Rodde called for a vote to disapprove of this past action. Mr. Hajjar highly recommended that the CEO get another opinion and he did not feel there was a specific precedent for this. Ms. Vanderweil said this board has spent a lot of time with no pay to always try to do what is best for the shareholders and this action concerned her. Mr. M. Kelmon believed that losing key employees at this time, however, would not be in the shareholders' best interest. Mr. Klein stated that he disagreed with the action, but the CEO was free to seek another opinion from an outside attorney.

Mr. R. Kelmon said that the CPAs had all the facts and know there was a pricing discrepancy between the CIT offer and this note transaction.

Mr. King reminded the Board that there was a motion on the floor from Mr. Rodde for a vote to disapprove of this past action. Ms. Vanderweil seconded the motion.

Voting against the disapproval of the action were R. Kelmon, M. Kelmon, and Ms. Young. Voting for the disapproval were all the outside directors D. King, S. Rodde, L. Vanderweil, D. Moore, and R. Hajjar.

On August 5, 2009, Trustee filed a first amended complaint against Ralph, Matt and Shawn seeking -- among other things -- a judgment both jointly and severally for $407,550 for original promissory notes the three defendants collectively owe to Debtor. There is no promissory note for the $1,050 loaned to Shawn in July 2002.

II.

ANALYSIS

Trustee's motion raises three grounds for liability: (1) a claim for money lent; (2) a claim for corporate waste; and (3) a claim under California corporations code section 310. Trustee seeks a separate judgment holding Defendants jointly and severally liable for the total promissory notes on the basis that Defendants lacked corporate authority to cancel the promissory notes in exchange for surrendering shares of Debtor's stock to Debtor for $1 per share in December 2008. Defendants assert that Ralph was pre-authorized to exchange the notes for shares of Debtor's stock based on the September 24, 2007 board resolution that granted Ralph broad authorization to have the outstanding employee loan repaid.

As explained by the Court at the March 19, 2010 hearing on the Motion, the elements for a claim for money lent are: an allegation of indebtedness, and a failure to repay any part of the loan. *Cf.* <u>Moya v. Northrup</u>, 10 Cal. App. 3d 276, 280 (1970).

In this case, the promissory notes executed by Matt and Shawn all indicate that those notes were paid in full on January 3, 2008.

> Although the payee has the burden of going forward
> to rebut the presumption that a paper stamped "paid" had
> in fact been discharged by payment, this is merely a
> burden of going forward and the ultimate burden remains

> on the defendant to establish the defense of payment.
> The fact that a promissory note is marked paid does not
> bar suit on it but raises a rebuttable presumption of
> payment that the payee may then rebut by proving that the
> note was so stamped by mistake or by one acting without
> authority.

6 Lary Lawrence, Anderson on the Uniform Commercial Code, §3-307:48 (3d ed. 2009). Thus, it appears that Trustee may rebut the presumption of payment by proving that the note was marked as paid in full by Ralph acting without authority. There is a material dispute of fact as to whether Ralph was acting without authority. Namely, Ralph believed that Ralph had authority at the time that Ralph both sent the October 31, 2007 letter to Matt and Shawn as well as at the time that Matt, Shawn and Ralph tendered their respective shares of common stock in exchange for the outstanding promissory notes. Debtor's board of directors subsequently disapproved of Ralph's actions at the January 8, 2008 board of directors meeting. However, there is a disputed issue of fact as to whether Ralph had authority **at the time** Ralph entered into those transactions on behalf of Debtor that precludes summary judgment at this time.

Regarding Trustee's claim under corporate waste, under Delaware law, directors are liable for corporate waste only where directors authorize an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration. <u>Glazer v. Zapata Corp.</u>, 658 A.2d 176 (Del. Ch. 1993).

As to Matt and Shawn, the defense for corporate waste is presumably whether a business person of ordinary, sound judgment could conclude that Debtor received adequate consideration for the

payment of the outstanding promissory notes executed by Matt and Shawn for the continued services of Matt and Shawn in addition to Debtor receiving outstanding shares of stock held by Matt and Shawn. Defendants assert that Matt and Shawn were told at the time that each received the original loans from Debtor that the loans were a form of additional compensation which would be forgiven eventually if each individual continued their employment with Debtor. In the fall of 2007, the compensation for both Matt and Shawn was reduced and both individuals threatened to resign from Debtor to pursue other employment opportunities. Ralph allegedly negotiated the agreement on behalf of Debtor whereby Debtor agreed to forgive the outstanding promissory notes in exchange for the return of an equal number of shares of Debtor's stock on a $1 per share basis up to the value of the outstanding loans if Matt and Shawn agreed to remain in Debtor's employ.

What Matt and Shawn were told at the time that each received the original loans from Debtor as well as whether both individuals threatened to resign from Debtor to pursue other employment opportunities in the fall of 2007 are material issues of fact that are in dispute that would preclude partial summary judgment as to corporate waste at this time as to Matt and Shawn.

There is no assertion that Ralph was told at the time that Ralph received the original loans from Debtor that the loans were a form of additional compensation which would be forgiven eventually if Ralph continued his employment with Debtor or that Ralph threatened to resign from Debtor in the fall of 2007. Any analysis of corporate waste with respect to Ralph is whether Debtor received adequate consideration for the payment of the outstanding

promissory notes executed by Ralph in exchange for Debtor receiving outstanding shares of stock held by Ralph at the rate of $1 per share. This question is also a question of disputed fact that precludes granting Trustee's motion for partial summary judgment.

Finally, per California Corporations Code § 310(a)(1) and (a)(2), no contract or other transaction between a corporation and one or more of the corporation's directors is either void or voidable because such director is present at the meeting of the board which authorizes, approves or ratifies the contract or transaction, if either: (1) the material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders in good faith, with the shares owned by the interested director or directors not being entitled to vote thereon, or (2) the material facts as to the transaction and as to such director's interest are fully disclosed or known to the board and the board authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified. If the contract or transaction is not approved as provided above, California Corporations Code § 310(a)(3) provides:

> As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of proving that the contract of transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified.

Trustee's motion for partial summary judgment cannot be granted at this time because there is an issue of material fact as to whether defendants have sustained defendants' burden under California Corporations Code § 310(a)(3). If the court finds that Ralph did not have authority under California Corporations Code § 310(a)(1) or (a)(2) to enter into the transactions that forgave the outstanding loans of Matt, Shawn and Ralph in exchange for the return of an equal number of shares of Debtor's stock on a $1 per share basis up to the value of the outstanding loans, under California corporations code § 310(a)(3), the burden falls to each defendant to prove that the transaction was just and reasonable as to Debtor at the time that the transaction was authorized by Ralph. Sammis v. Stafford, 48 Cal. App. 4th 1935, 1943-44 (1996).

Defendants assert that Matt and Shawn were told -- at the time that each received the original loans from Debtor -- that the loans were a form of additional compensation which would be forgiven eventually if each individual continued their employment with Debtor. In the fall of 2007, the compensation for both Matt and Shawn was reduced and both individuals allegedly threatened to resign from Debtor to pursue other employment opportunities. Ralph allegedly negotiated the agreement on behalf of Debtor whereby Debtor agreed to forgive the outstanding promissory notes in exchange for the return of an equal number of shares of Debtor's stock on a $1 per share basis up to the value of the outstanding loans if Matt and Shawn agreed to remain in Debtor's employ. What Matt and Shawn were told at the time that each received the original loans from Debtor -- as well as whether both individuals threatened to resign from Debtor to pursue other employment

opportunities in the fall of 2007 -- are material issues of fact that are in dispute that preclude partial summary judgement as to Matt and Shawn at this time.

In Ralph's case, there is a material issue of fact as to whether the exchange at a value of $1 per share was just and reasonable as to Debtor at the time that Debtor forgave Ralph's outstanding loans in exchange for the return of an equal number of shares of Debtor's stock on a $1 per share basis up to the value of the outstanding loans.  The Court finds that there is a material issue of fact as to each of the three defendants as to as to whether Ralph's actions on behalf of Debtor fall within the exception of California Corporations Code § 310(a)(3), and partial summary judgment is denied at this time.

### III.

### CONCLUSION

For the foregoing reasons, Trustee's motion for partial summary judgment is denied.  Counsel for Trustee shall prepare a form of order consistent with this ruling and shall submit the proposed order to the Court after serving counsel for Defendants.

Dated: 9/23/10

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

Court Service List

Linda Sorensen
Stromsheim & Associates
201 California Street, Suite 350
San Francisco, CA 94111


Fenn. C. Horton III
Pahl & McCray
225 W Santa Clara Street, Suite 1500
San Jose, CA 95113


Office of the U.S. Trustee / SJ
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004